**Leo SHEFFIELD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68153.**

Court of Criminal Appeals of Texas, Panel No. 1.

Nov. 4, 1981.

Harry R. Heard, Longview, for appellant.

Rob Foster, Dist. Atty. and Lew Dunn, Asst. Dist. Atty., Longview, Robert Huttash, State's Atty., Austin, for the State.

Before ROBERTS, TOM G. DAVIS and W. C. DAVIS, JJ.

## OPINION

ROBERTS, Judge.

This is an appeal from an order revoking probation. On September 11, 1975, the appellant was convicted of delivery of a controlled substance. The jury assessed a punishment of a $5000 fine and confinement for 10 years, with a recommendation that the term of confinement be probated. The trial court followed this recommendation. On direct appeal we affirmed this conviction in a per curiam opinion.

On October 30, 1980, the State filed a motion to revoke the appellant's probation. The motion alleged in two identical paragraphs that the appellant did "intentionally and knowingly deliver to MARCO DELGADO, a controlled substance, namely phenmetrazine, by constructively transferring the same to the said MARCO DELGADO." After a hearing the trial court revoked the appellant's probation and sentenced him to confinement for ten years in the Texas Department of Corrections.

Since the appellant challenges the sufficiency of the evidence, we set forth the facts of this case in some detail.

Martha Coleman testified that she had known the appellant "for years." On October 3, 1980, she telephoned him to arrange a purchase of Preludin pills. The appellant agreed to meet Coleman at his place of business, a sandwich shop in Longview, but told her he would not deal with her until she paid him $30.00 she owed him from an earlier transaction.

At about 12:40 that afternoon Coleman arrived at the sandwich shop accompanied by Marco Delgado, an undercover officer with the Gregg County Sheriff's Office. They parked the car, which Delgado was driving, in front of the shop. Coleman asked appellant for four Preludin pills. At the same time Delgado handed Coleman the $30.00 which she owed the appellant. Coleman gave this money to the appellant.

The appellant then told Coleman to come with him into the sandwich shop. Once inside, the appellant got a bottle of pills from behind the counter and handed Coleman four of them. He told her that he did not want to deal with Delgado; that he did not know who he was. The appellant told Coleman that when she got the money for the pills ($60.00) from Delgado she should give it to "Mary Jo," apparently an employee of the appellant.

Coleman returned to the car, gave Delgado the four pills, and obtained from him the $60.00. She then tried to hand the money to the appellant. The appellant refused to take the money directly from Coleman. He told "Mary Jo" to take it. "Mary Jo" walked over to the car, took the money from Coleman, then handed it to the appellant who put it in his pocket. Coleman and Delgado then drove away.

Later that afternoon, about 4:00 p. m. a similar transaction took place involving the same four people. Delgado and Coleman returned to the sandwich shop (in a different car this time). The appellant walked out to the car. Coleman told him she wanted some more Preludins. She turned to Delgado to ask him how many he wanted. Delgado told her he wanted four, and she relayed the message to the appellant. The appellant then went back into the sandwich shop. When he walked back out he handed something to "Mary Jo" who then walked over to the car. With the same hand in which she had received the goods from the appellant, "Mary Jo" handed Coleman four pills identical in appearance to those Coleman had received from the appellant in the first transaction. Coleman handed these to Delgado and received from him another $60.00. Once again she was directed by the appellant to hand the money to "Mary Jo."

"Mary Jo" then walked back to the appellant and handed him the money. Again he put the money in his pocket. Coleman and Delgado then left.

Delgado substantially corroborated Coleman's testimony. He could not testify about what had occurred inside the sandwich shop during the first transaction since he had remained in the car.

Claude Latta, a Department of Public Safety chemist, testified that the laboratory analysis of two of the eight pills showed that they contained phenmetrazine.

The appellant urges that the trial court abused its discretion in revoking his probation because the evidence is insufficient to show that he had committed an offense.

■ His first contention is that V.A.C.S. Art. 4476–15, Sec. 1.02(8), requires corroboration of the testimony of an offeree in order to prove a delivery of a controlled substance. The appellant's argument is correct when the proof shows only an offer to sell a controlled substance. However, the motion to revoke probation in this case charged the appellant with delivery by constructive transfer. No corroboration is required under Sec. 1.02(8) to prove a delivery in the form of a constructive transfer. We reject this contention by the appellant.

■ In his next ground of error the appellant contends that the State failed to show that prior to delivery the controlled substance was directly or indirectly under his control. This contention has no merit.

With regard to the first delivery, Coleman's testimony established that the appellant re-entered his sandwich shop with her, walked over to the counter and took out a bottle of pills. This was in response to Coleman's request to buy four Preludins. This evidence is sufficient to show the appellant's control of the pills.

With regard to the second delivery, and again in response to a request for Preludins, the appellant walked into his shop and returned momentarily. He then handed something to "Mary Jo" who, with the same hand, then handed Coleman four pills identical in appearance to those delivered earlier. This evidence is sufficient to establish the appellant's control of these pills prior to delivery.

■ The appellant also contends that the evidence is insufficient to establish that the appellant made a delivery to Marco Delgado. He argues that the State failed to show an intent to deliver constructively or otherwise to Delgado. This contention is overruled.

The evidence showed that the appellant saw Delgado with Coleman at each delivery. Although he refused to deal directly with Delgado, the appellant told Coleman to give the money she got from Delgado to "Mary Jo." During the second delivery, the appellant was present at the car when Coleman turned to Delgado to ask him how many pills he wanted.

In *Gonzalez v. State*, 588 S.W.2d 574 (Tex.Cr.App.1979), we stated that a constructive transfer "contemplates that the transferor is at least aware of the existence of the ultimate transferee before he may be said to have delivered or made a delivery of a controlled substance to another through a third person." 588 S.W.2d at 577.

Here the evidence showed that the appellant was not only aware of Delgado's existence and identity, but also acted upon Delgado's instruction concerning the number of pills desired during the second delivery. This evidence is sufficient to show a constructive transfer from the appellant to Delgado as alleged.

■ Next the appellant contends that the court erred in revoking probation because the physical evidence was tainted by commingling. Delgado testified that after each delivery he placed each group of four pills in the same pocket of his jacket. He also testified that since all eight pills appeared to be identical it was impossible for him to identify which four pills came from which delivery.

Under other circumstances this commingling of the evidence might irreparably taint the evidence. For this reason we do not encourage this practice. However, un-

der the circumstances of this case there was no harm from commingling the eight pills.

There was no suggestion that any of the pills came from any person other than the appellant. Therefore, whether a particular group of four pills came from the first or second delivery, or from both, the evidence is sufficient to show that each of the pills was delivered by the appellant to Delgado on the day alleged in the two counts of the motion to revoke probation.

■ Finally the appellant contends that the State failed to prove all the elements of the offense.

V.A.C.S. Art. 4476–15, Sec. 4.03(a), provides:

"(a) Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1, 2, 3, or 4."

V.A.C.S. Art. 4476–15, Sec. 4.02(d), provides:

"(d) Penalty Group 3. Penalty Group 3 shall include the following controlled substances:

"(1) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system:

\*   \*   \*   \*   \*   \*

"(D) Phenmetrazine and its salts."

The appellant contends that under Sec. 4.02(d)(1)(D) the State was required to prove that the quantity of phenmetrazine contained in the pills sold by the appellant had "a potential for abuse associated with a stimulant effect on the central nervous system." In other words, he urges that the phrase beginning "having a potential for abuse ... " modifies *quantity* rather than *substances*. Thus, under his interpretation of the statute, only certain quantities of the listed substances are prohibited, and it is necessary for the State to prove that the quantity contained in the compound delivered has the prohibited effect.

In answering this contention we are unaided, so far as our research reveals, by any earlier decision of this Court construing this or similar provisions of the Controlled Substances Act. However, at least three United States Courts of Appeals have rejected similar arguments concerning the federal Controlled Substances Act of 1970, 21 U.S.C. Secs. 801 *et seq.*

In *United States v. Nickles*, 509 F.2d 810 (5th Cir. 1975) the appellant was charged with violation of 21 U.S.C. Sec. 841(a)(1), which *inter alia* prohibits possession with intent to distribute a controlled substance listed in Schedule III, 21 U.S.C. Sec. 812. In that case the substance was phencyclidine. The relevant portion of Schedule III provides:

"(b) Unless specifically excepted or listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system:

\*   \*   \*   \*   \*   \*

"(7) Phencyclidine."

The appellant Nickles argued that in order to establish that the substance in his possession was a controlled substance within Schedule III, the government was required to prove that it *in fact* had a depressant effect on the central nervous system. In rejecting this argument the court stated:

"We think the phrasing of the statute clearly evinces a Congressional determination of the actual depressant effect of the specifically listed substances, including phencyclidine. This finding precludes any necessity for the Government's demonstrating that depressant effect afresh in each trial under Sec. 841(a)(1), and we do not read the statute to require such proof." (footnote omitted)

*Id.* at 811.

In *United States v. White*, 560 F.2d 787 (7th Cir. 1977), the appellant was charged with the distribution of d, 1–amphetamine in violation of 21 U.S.C. Sec. 841(a)(1). At the time of the offense amphetamines were listed as Schedule II substances. The relevant portion of Schedule II was:

"(d) *Stimulants.* Unless specifically excepted or listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system: (1) Amphetamine, its salts, optical isomers, and salts of its optical isomers."

The appellant White argued that this language required proof that the amphetamines in question have a stimulant effect on the central nervous system. In rejecting the argument the court stated:

"Although certain of the substances [listed in the schedules] have quantitative concentration levels prescribed and others refer to such concepts as chemical equivalents, every substance listed appears generically, and in none is anything other than chemical identity (or quantity or equivalence) required to establish a substance as controlled. The entire statutory scheme makes it clear that the effects of any substance are considered fully in making the control and scheduling decisions on that substance."

*Id.* at 789.

Although neither *Nickles* or *White* answered the precise question now before this Court the reasoning of the cases is helpful. In analyzing the analogous federal act both courts held that Congress had already determined the effect of the controlled substances. Therefore, the proof necessary to show a violation is the identity of the substance, not its effect.

A case addressing the exact contention raised by the appellant in the instant case is *United States v. Picklesimer,* 585 F.2d 1199 (3rd Cir. 1978). The defendants were charged with possession with intent to distribute phencyclidine in violation of 21 U.S.C. Sec. 841(a)(1). Like the appellant in the case before us, the defendants in *Picklesimer* urged the court to construe the rele-

vant portion of Schedule III, set out above, to require proof of a sufficient quantity of the drug to have a depressant effect upon the central nervous system. The court declined to adopt this construction as "contrary to the clear intention of Congress." *Id.* at 1200.

In reaching its conclusion the court noted three features of the federal act. First, in creating the different schedules Congress established five schedules of controlled substances

". . . ranging from Schedule I substances, which have no medical use and are subject to serious abuse, to Schedule V substances, which do have a medical use and are less susceptible to use."

*Id.* at 1202–1203.

Second, the court noted that the Attorney General has the right to revise the schedules.[1] Thus the phrase "having a depressant effect on the central nervous system" provides guidance to the Attorney General so that drugs having similar effects can be placed in the same schedule.

Third, when Congress intended for the quantity of the drug to be dispositive it indicated its intent unequivocally.[2]

We find the same three features present in the Texas Controlled Substances Act. The substances are ranked in Schedules I through V and Penalty Groups 1 through 4 according to their potential for abuse, their acceptance for use in medical treatment, and their potential for addiction.[3] The Commissioner of Health has the power to revise the schedules.[4] And finally, the Legislature has clearly indicated its intent to make quantity dispositive when it chose to do so.[5]

We are, of course, aware of one significant difference between the state and federal acts. Unlike the state scheme, the federal act has only one set of schedules.

---

1. See 21 U.S.C. Sec. 811.

2. See 21 U.S.C. Sec. 812, Schedule III(d) and Schedule V.

3. See V.A.C.S., Art. 4476–15, Sec. 2.10 through 2.15.

4. See V.A.C.S., Art. 4476–15, Sec. 2.09 through 2.16.

5. See V.A.C.S., Art. 4476–15, Sec. 2.05(d), Sec. 2.07(b), Sec. 4.02(d)(5), Sec. 4.02(e).

Thus, the revision power of the Attorney General can affect the criminal penalties for possession and delivery. Under our state scheme the Commissioner of Health has the power to revise only the schedules. He cannot revise the penalty groups, and thus cannot affect the penalties for manufacture, delivery or possession.

For two reasons, we do not believe that this difference should lead to a result different from that reached under the federal act. First, the phrase "having a potential for abuse associated with a stimulant effect on the central nervous system" offers guidance to the Legislature when it revises the penalty groups on its own. Second, when the Commissioner of Health revises the schedules the Legislature may well choose to amend the corresponding penalty groups accordingly. Either way, the phrase guides the revision of the penalty groups and helps insure the ranking of controlled substances by keeping drugs having similar effects together in the same schedules and penalty groups.

We are persuaded that the construction of V.A.C.S., Art. 4476–15, Sec. 4.02(d)(1), urged by the appellant is incorrect. We adopt the reasoning of the United States Court of Appeals in *Picklesimer, supra,* and hold that the phrase "having a potential for abuse associated with a stimulant effect on the central nervous system" is descriptive of the type of substances listed in Sec. 4.02(d)(1). The phrase modifies *substances* rather than *quantity.*

Therefore, there was no necessity for the State in this case to prove the amount or the effect of the phenmetrazine contained in the pills introduced into evidence. The State showed that the pills contained the controlled substance, phenmetrazine. This was sufficient under the statute.

We hold that the trial court did not abuse its discretion and affirm the judgment.